[No. 20267. Department Two. March 10, 1927.]

PUGET SOUND POWER & LIGHT COMPANY, *Respondent*, v. THE CITY OF SEATTLE, *Appellant*.[1]

[1] FRANCHISES (6-8)—SALE OR ASSIGNMENT—TERMINATION—RIGHT TO TRUST FUND ON TERMINATION. The successor in interest of city franchises under which the original grantees were bound to maintain with the city a trust fund to cover emergency liabilities to the city, becomes the owner of the fund, after the lapse of time, in view of the failure of its predecessors to claim any interest therein and of the continuing nature of the obligation devolving upon the successor to keep the fund intact.

[2] SAME (6-8). The sale to a city of a street railway system specifically describing the property sold, together with "all other real and personal property now owned, held or used by the company for local street railway purposes . . . *excepting money and choses in action*," with a surrender of all franchises, does not include or pass title to money deposited with the city treasurer as an "emergency fund" required by the franchises to be maintained in a specified sum to meet and pay emergent liabilities to the city, upon which the city could

[1]Reported in 253 Pac. 1083.

draw in case the company failed to immediately pay a claim on demand.

[3] Franchises (6)—Release (5) — Assignment — Operation of Release of All Demands. A general release discharging all claims and demands and rights of action of either party, upon agreeing to sell a street railway system to the city, limited to its date, Feb. 10, did not pass title to or release or abandon the company's right to a trust fund deposited with the city treasurer to meet emergent liabilities to the city, which the company was required by its franchises to maintain at a specified sum until surrender of the franchises which were in full force until March 31; "money and choses in action" being expressly excepted from the deed of conveyance made on the later date.

[4] Limitation of Action (15)—Written Contracts—Franchise Accepted in Writing. An action to recover a trust fund held by a city required by written franchises which were accepted in writing, is an action upon a written contract or liability express or implied arising from a written contract, within the six year limitation of Rem. Comp. Stat., § 157; there being an implied liability to return the trust fund on surrender of the franchises.

[5] Interest (25)—Time and Computation—Creation or Accrual of Indebtedness. The liability of a city to surrender a trust fund, deposited and held under franchises, arose immediately upon a surrender of the franchises, and entitles the grantee to interest thereon from that date, without any previous demand for payment.

Cross-appeals from a judgment of the superior court for King county, Kinne, J., entered July 2, 1926, upon findings in favor of the plaintiff, in an action for an accounting under a trust fund agreement. Affirmed, with modification as to interest on plaintiff's cross-appeal.

*James B. Howe, Emory E. Hess,* and *Edgar L. Crider,* for plaintiff-appellant.

*Thomas J. L. Kennedy, Ray Dumett* and *Walter L. Baumgartner,* for defendant-appellant.

Tolman, J.—This is an equitable action brought by the respondent, as plaintiff, to require the city of Seattle to account for and pay over what is alleged to be

a trust fund, together with interest thereon from March 31, 1919, when it is averred the trust ceased. The case was tried to the court, resulting in a decree directing the city to pay over to the plaintiff $11,900, with interest from January 15, 1925. The city has appealed from the whole of the decree, and the plaintiff has cross-appealed from the refusal to award interest from March 31, 1919.

Respondent in its complaint alleges that, prior to February 10, 1919, it was the owner of and was operating under a number of franchises theretofore granted by the city, each of which required the grantee, its successors and assigns, to keep on deposit with the city treasurer, to the credit of the board of public works, a specific sum denominated as an "emergency fund," the purpose being as described in the several franchises as follows:

"Whenever in the opinion of said board of public works an emergency arises for the immediate repair of any dangerous defect found to exist in that part of any street, alley, avenue or public place required by this franchise to be kept in repair by said grantee, its successors or assigns, and the said grantee, its successors or assigns, have failed on notice to immediately repair the same, the said board of public works shall cause said repair to be made at once and if said grantee, its successors or assigns, shall not promptly pay the bill for the cost of such repairs when made out and presented at the office of said grantee, its successors or assigns in said city, then said board may, on the order of the city council, draw the amount of such bill from said emergency fund, which fund shall be reimbursed by said grantee, its successors or assigns, without delay and kept up to said amount of . . . . . . . . . . . . . . . dollars as aforesaid."

It appears without dispute that respondent and its predecessors in interest made and kept up such deposits in the total amount found by the trial court.

The issues raised by the appellant city seem to be (1) that respondent was never the owner of these deposits or any part thereof; (2) that the city, by its purchase of respondent's street railway system, acquired all respondent's rights to the fund, if it ever had any such rights; (3) that the contract of purchase of February 10, 1919, includes a general mutual release provision, and if the respondent ever had any right to the fund, it by that provision released that right; and (4) that, in any event, respondent's cause of action, if any ever existed, is barred by the three-year statute of limitations.

[1]  Forty-three different and separate franchises are involved in this action, only one of which was granted directly to the respondent. We have labored over the various exhibits by which respondent deraigns its title from the original grantees, and they appear in each instance to be sufficient to carry the interest of the grantor in this fund as it then existed. And in view of the lapse of time, the failure of any of respondent's predecessors in interest to lay claim to any portion of the fund, and the continuing nature of the obligation which devolved upon the successors and assigns of the original grantees to keep the fund intact, we have no hesitancy in holding that respondent was the beneficial owner of the fund at the time it contracted to sell its street railway system to the city.

[2]  But the city argues, if the respondent acquired title to the fund by the assignment of the franchises to it, then the city likewise acquired respondent's title to the fund when it purchased the street railway system. Respondent conveyed its street railway system to the city on March 31, 1919, pursuant to a contract entered into February 10, 1919, authorized by prior ordinances. The prior ordinances, the contract of February 10 and the deed of March 31, 1919, (except for a

few minor errors in descriptions not here of any importance) are identical in their several provisions as to the property to be and which was conveyed. Much of the property was specifically described and there is nothing in the specific descriptions which could even be thought to apply to the trust fund now under consideration. Following the specific descriptions the deed provides:

"Also any and all real and personal property or interest therein not hereinbefore enumerated or described now owned, held, used or occupied by said company exclusively for local street railway purposes, except substations and the land upon which the same are located *and excepting money and choses in action.*"

The deed further provides:

"And the company pursuant to such ordinance and contract does hereby surrender unto the City of Seattle each and every street railway franchise and street railway permit by virtue of which the company operates the property mentioned in Ordinance No. 39025 and Ordinance No. 39069, both of the City of Seattle, or any part of such property, whether such street railway franchises or street railway permits were granted by the City of Seattle or by other municipalities now a part of the city, together with all rights under each and every such street railway franchise and street railway permit, including all street railway franchises and street railway permits granted to the company and predecessors of the company by King county, pursuant to which the company operates any part of the property described in said ordinances and contract, or either of them, within the corporate limits of the city.

"And the company does hereby quitclaim and forever release and transfer to the city, its successors and assigns, all such street railway franchises and street railway permits granted to the company and any predecessors of the company by King county, pursuant to which the company operates any part of the property described in such contract and in Ordinance No.

39025 of the City of Seattle within the corporate limits of the city.

"Together with all and singular the rights, tenements, hereditaments and appurtenances unto the premises belonging or in any wise incident or appertaining."

If the city acquired title to these trust funds, it must have been by virtue of these provisions, but when they are read carefully and as a whole, it fully and clearly appears that respondent was surrendering its franchises, thereby divesting itself of any further right to operate street railways; the city was acquiring no right under the franchises because it needed no such franchise right and no such fund to enable it to operate street railways; the funds in question were not property used in the operation of the street railway, but merely security for the performance of its franchise duties. Money and choses in action were specifically excepted, and the trust fund must either have been respondent's money, or, when by the delivery of the deed the purpose for which it was deposited ceased, it then became a chose in action, to which the city had no defense, save only a possible prior default under the terms of the franchises, which is not even suggested.

There is certain other evidence in the record tending to support this view, but it was introduced over the city's objection and its admission is now urged as error. While in large part we think this evidence admissible, some of it was received by the trial court only to complete the record and may have been technically inadmissible. Being fully satisfied, without considering this questioned evidence, we have disregarded it.

[3] The third defense is that the general release embodied in the contract of February 10, 1919, includes the demand here asserted. The clause relied upon reads:

"The parties hereby forever release and discharge each other from each and every claim, demand and right of action of whatsoever kind and description arising or accruing from the beginning of the world to the date of this agreement, excepting those claims, rights, demands, obligations, actions and judgment herein expressly mentioned: Provided, that this general release shall be of no force or effect unless the property is transferred to the city pursuant hereto."

It must be first noted that the release by its terms is limited to the date of the agreement, or February 10, 1919. Respondent did not have, and could not then have, any claim, demand or right of action against the city in any way affecting or relating to this fund, nor could such right accrue to it while it continued to operate under the then existing franchises. Its duties under the franchises remained in full force until those franchises were surrendered or terminated. We have carefully considered the rules for the construction of such an instrument suggested by the city, but find nothing in the instrument, construed as a whole, or in the situation of the parties, which would warrant us in holding that there was an intent on either side that by that instrument the city should acquire ownership of this fund or that respondent should release or abandon its right thereto.

[4]    The last point raised is that the action is barred by the three-year statute of limitations. Rem. Comp. Stat., § 157 [P. C. § 8162], provides that "an action upon a contract in writing, or liability express or implied arising out of a written agreement" may be brought within six years; while § 159 provides: "An action upon a contract or liability, express or implied, which is not in writing, and does not arise out of any written instrument" must be brought within three years. The franchises were written instruments within

the meaning of these statutes. They were required to be and were accepted by the grantees in writing. Under these written agreements, the deposits were made and the money was held by the city. True, there is no express provision in the franchises to the effect that the city shall return the money when the franchise is surrendered or otherwise terminated, but there is an implied obligation to so return the deposit when its purpose is served and no further liability for which it could respond can occur. These statutes were carefully considered and construed in *Caldwell v. Hurley*, 41 Wash. 296, 83 Pac. 318, and in *Lindblom v. Johnston*, 92 Wash. 171, 158 Pac. 972, and the doctrine there announced has since been followed. The six-year statute must be applied.

[5] While the trial court applied the six-year statute, he allowed interest only from January 15, 1925; for what reason does not very clearly appear. It is an admitted fact that respondent surrendered its franchise at midnight on March 31, 1919, and of course, except as to liabilities then existing against the fund, the purpose of the deposit was completely fulfilled, and the implied obligation to repay immediately arose and became a liability without the necessity for any demand or other action. The city knew the purpose for which the deposit was made, knew that such purpose had ceased, and the law presumes it knew that the liability then attached. We see no sound reason for denying interest at the legal rate from April 1, 1919.

The judgment is modified upon the cross-appeal to the extent of allowing interest on the principal sum recovered, at the rate of six per cent per annum from April 1, 1919, and as so modified the judgment is affirmed.

Mackintosh, C. J., Bridges, Parker, and Askren, JJ., concur.